UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CASE NO. _____ |
| BANK OF AMERICA, N.A., | ) ) ) |
| Defendant. | ) ) |

# COMPLAINT

The plaintiff, United States of America, by and through its counsel, complains and alleges the following:

## Introduction

**1.** The United States brings this civil action pursuant to 26 U.S.C. § 6332(d), to enforce the IRS Notice of Levy served on the defendant, Bank of America, N.A. (the "defendant" or the "Bank"), to collect the unpaid employment tax liability of the taxpayer, Gadsden Buggy Works, L.L.C. d/b/a Moultrie Toyota ("GBW"), for the tax period ended June 30, 2013.  In addition to or in the alternative, the United States seeks pursuant to 26 U.S.C. § 3505, to obtain a judgment against the Bank for the unpaid withholding taxes of GBW's employees for the tax periods ended June 30, September 30, and December 31, 2013, plus interest thereon from May 8, 2023, until paid.

## Authorization To File Suit

**2.** The United States commences this civil action pursuant to Sections 7401 and 7403(a) of the Internal Revenue Code, 26 U.S.C., and at the direction of the Attorney General of the United States, and the request of, and with the authorization of, the Internal Revenue Service ("IRS"), Office of Chief Counsel, a delegate of the Secretary of the Treasury of the United States.

17794806.1

**Jurisdiction and Venue**

3. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. § 7402(a).

4. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and 1396 because the liability of the subject internal revenue taxes accrued, the subject tax returns were filed, and a substantial part of the events or omissions giving rise to this civil action occurred in Etowah County, Alabama.

**Party**

5. The defendant, Bank of America, N.A., is a national banking association authorized to do business in the State of Alabama as a foreign corporation.

**General Background**

A. *GBW's Unpaid Employment Tax Liabilities*

6. During the calendar year 2013, the taxpayer, Gadsden Buggy Works, L.L.C. d/b/a Moultrie Toyota, an Alabama limited liability company, operated an automotive dealership in Rainbow City, Etowah County, Alabama.

7. GBW filed employment tax returns (i.e., Forms 941) for the tax periods ended June 30, September 30, and December 31, 2013.  Although GBW filed the returns, it failed to pay the taxes that it reported on those returns.

8. On August 9, November 18, and December 13, 2013, a delegate of the Secretary of the Treasury made timely assessments against GBW for the unpaid federal employment taxes for the tax periods ended June 30, September 30, and December 31, 2013, respectively, plus interest and statutory additions, and gave notices of the assessments and made demand for their payment.

9. As of May 8, 2023, the unpaid balance of GBW's federal employment tax assessments *(excluding accruals)* totaled $107,486 and consists of the following amounts for the

following tax periods:

| Tax Period | Form | Taxes | Penalties | Interest | Fees & Costs | Payments | Total (*Excluding Accruals*) |
|---|---|---|---|---|---|---|---|
| 6/30/13 | 941 | $ 91,309 | $ 9,460 | $ 10,154 | $ 83 | $ <94,249> | $ 16,757 |
| 9/30/13 | 941 | 68,016 | 9,460 | 24,987 | 42 | <60,112> | 42,393 |
| 12/31/13 | 941 | 24,943 | 8,730 | 14,663 | - | - | 48,336 |
| **Total (*Excluding Accruals*)** | | **$ 184,268** | **$ 27,650** | **$ 49,804** | **$ 125** | **$ <154,361>** | **$ 107,486** |

10. Despite having received notices of the assessments and demand for their payment, GBW has failed and refused to pay the unpaid balance of federal employment taxes assessed against it for the tax periods ended June 30, September 30, and December 31, 2023, plus interest and statutory additions.

11. On August 30, 2013, a delegate of the Secretary of the Treasury filed a Notice of Federal Tax Lien against GBW with the Alabama Secretary of State for the unpaid federal employment tax assessment for the tax period ended June 30, 2013, plus interest and statutory additions.

12. On January 3, 2014, a delegate of the Secretary of the Treasury filed a Notice of Federal Tax Lien against GBW with the Alabama Secretary of State for the unpaid federal employment tax assessments for the tax periods ended June 30 and September 30, 2013, plus interest and statutory additions.

13. On January 10, 2014, a delegate of the Secretary of the Treasury filed a Notice of Federal Tax Lien against GBW with the Alabama Secretary of State for the unpaid federal employment tax assessments for the tax period ended December 31, 2013, plus interest and statutory additions.

14. On July 30, 2014, a delegate of the Secretary of the Treasury filed a Notice of Federal Tax Lien against GBW with the Alabama Secretary of State for the unpaid federal

employment tax assessment for the tax period ended September 30, 2013, plus interest and statutory additions.

15. GBW terminated its business operations in December 2013. In February 2014, GBW's assets were liquidated, and the proceeds were disbursed in a state receivership proceeding. See ¶¶ 34-37, *infra*.

16. Because GBW no longer exists, it has no assets from which the IRS may collect its unpaid employment tax liabilities.

### B. *The Bank's Loan to GBW*

17. During the relevant periods, the Bank loaned funds to GBW, and in connection with that loan arrangement, the Bank monitored and controlled the disbursement of funds that were made from GBW's bank accounts.

18. On or about July 31, 2012, GBW obtained a revolving line of credit from the Bank in the stated principal sum of $5,750,0000 (the "Bank's loan"). The terms governing the Bank's loan are set forth in the Vehicle Flooring and Security Agreement dated July 31, 2012, as amended and modified by (1) Amendment No. One to Vehicle Flooring and Security Agreement dated November 21, 2012; (2) Agreement dated as of May 7, 2013; and (3) Loan Modification Agreement dated as of May 13, 2013, as amended and modified by the First Amendment to the Loan Modification Agreement dated as of August 6, 2013 and as further amended and modified by the Second Amendment to the Loan Modification Agreement dated as of November 21, 2013 (collectively, the "Floor Plan Agreement").

19. The Bank's loan was secured, *inter alia*, by the following collateral:

> a continuing security interest in the following personal property of [GBW] accounts, chattel paper, deposit accounts, documents, general intangibles, intellectual property, instruments and inventory, whether now owned or existing or hereafter acquired or arising, wherever located, all insurance policies, insurance proceeds, books and records (relating to the foregoing, and cash and non-cash proceeds and products thereof, as such

4

terms may be defined by Article 9 of the Uniform Commercial Code (collectively, the "Collateral").

See Section 2 of the Floor Plan Agreement.

20. On August 20, 2012, the Bank filed a UCC Financing Statement with the Alabama Secretary of State, Instrument No. 12-7223966, naming GBW and the Bank as the debtor and secured party of the Bank's loan, respectively, and stating that the collateral securing the Bank's loan included, *inter alia*, "[a]ll accounts . . . deposits . . . now owned or hereafter acquired by [GBW]." *See also,* Section 2 of the Floor Plan Agreement, *supra*.

21. The Bank conducted routine audits of GBW's financial condition. Indeed, after an audit conducted on February 21, 2013, the Bank discovered that GBW had sold approximately 112 automobiles without reimbursing the Bank for the initial advance, as was required under the Floor Plan Agreement.

22. On May 7 and 13, 2013, following the Bank's February 21, 2013 discovery, GBW and the Bank modified, in writing, the terms of the Bank's loan to establish procedures to ensure that the Bank had the ability to monitor and control the disbursements from all of GBW's deposit accounts on a daily basis, until such time as all of GBW's deposit accounts, wherever located, were transferred to the deposit accounts maintained at the Bank. In this respect, the parties' Loan Modification Agreement dated May 13, 2013, at page 4, § 3(h), provided, in pertinent part:

> *Borrower's Accounts*. [GBW] acknowledges and agrees the following checking accounts all of "Borrower's Accounts" (as defined in the Second Agreement) as of the Execution Date [May 7, 2013]:
>
> (i) Bank of America:   xxxxxx9100;
> (ii) Generations Bank:   xxxx7755;
> (iii) Generations Bank:   xxxx7828;
> (iv) Regions Bank:   xxxxx8586;
> (v) BBVA Compass:   xxxx7881; and
> (vi) Cadence Bank:   xxxx7419 (hereinafter the "Payroll Account").
>
> [GBW] acknowledges and agrees to provide [the Bank] by 9:00 am E.S.T. each Banking Day (1) online screen shots of each and every one of

5

> "Borrower's Accounts" (as defined in the Second Agreement) itemizing in detail all daily and/or weekend transactions.  [GBW] shall continue to ensure the "Transfer" (as defined in the Second Agreement) occurs on or before May 31, 2013 on all of "Borrower's Accounts" (as defined in the Second Agreement), with the exception of the Payroll Account, in accordance with the Second Agreement.  [GBW] represents the Payroll Account is the sole payroll account of [GBW].  [The Bank] reserves the right to demand the "Transfer" (as defined in the Second Agreement) of the Payroll Account to occur at a later date to be determined in its sole and absolute discretion.

23. The Second Agreement executed by the parties on May 7, 2013, at page 3, § 3(b) identified the term "Transfer," as follows:

> *The Transfer to BOA Deposit Account of [A]ll [F]unds*.  In accordance with Section 7.3 of the Security Agreement, [GBW] shall transfer any and all funds in any and all existing accounts used for the maintenance of the business, cash management, operating and administrative deposit accounts ("Borrower's Accounts") directly to a deposit account with [the Bank] on or before the Deadline (the "Transfer").  Upon the Transfer, [GBW] shall immediately close any and all existing Borrower's Accounts and provide evidence of same to [the Bank] by the Deadline.  Such evidence and Transfer shall be subject to [the Bank]'s sole and absolute satisfaction.

24. In May 2013, GBW maintained the following deposit accounts at the Bank: (1) Checking Account No. xxxx-xxxx-9100, identified as GBW's Operating Account (the "Account No. 9100"); and (2) Checking Account No. xxxx-xxxx-9113, identified as GBW's Disbursement Account (the "Account No. 9113").

25. According to certain bank statements that the IRS summoned, the Bank made substantial withdrawals from GBW's checking accounts on a frequent and ongoing basis and applied the withdrawals in payment of the loan that it made to GBW.  For instance, the Bank withdrew approximately $1,828,353, $1,786,608, and $1,396,709 from GBW's Account No. 9100 in May, June, and July 2013, respectively.

26. Further, after the Bank's February 21, 2013 discovery, it began to exercise more and more control over GBW's accounts.  By May 7, 2013, when the Bank implemented the

6

requirement that GBW transfer all of its funds to the Bank's accounts, it had already begun to monitor and control GBW's funds on an ongoing basis. The Bank determined whether funds would be advanced to GBW and whether funds would be disbursed by GBW. In this respect, the Bank advanced funds to GBW in an amount sufficient to pay only the net wages of its employees, and not the taxes required to be deducted and withheld from those wages.

27. On August 6, 2013, the parties entered into the First Amendment to the Loan Modification Agreement dated May 13, 2013 (the "First Amendment"). In the First Amendment, at page 5, § 3(j), GBW agreed to hire and retain Gulf Atlantic Capital Corporation as its Chief Restructuring Officer (the "CRO") effective August 6, 2013. The First Amendment, at page 5, § 3(h), also required that effective August 6, 2013, the CRO must be included on all of the Borrower's Accounts "as an authorized and required signatory thereon, including without limitation, on any and all disbursements and checks written therefrom."

28. As of August 6, 2013, GBW continued to maintain two deposit accounts at the Bank, Account Nos. 9100 and 9113.

29. Recognizing that [GBW] had not paid the expenses of the CRO, the parties executed the Second Amendment to the Loan Modification Agreement on November 21, 2013 (the "Second Amendment"), agreeing, in pertinent part:

> *CRO.* [GBW] acknowledges and agrees that on the Execution Date [November 21, 3013], the CRO is, and at all times until the Payoff is received by [the Bank], in full and sole control and possession of the Collateral, Borrower's Property, any Proceeds, documents, books and records, accounts and any other assets of [GBW] and [its] dealership, thereby allowing the CRO to perform its duties and responsibilities in its capacity under the Amended Loan Modification Agreement as amended by this Agreement. [GBW] shall continue to bear all expenses reasonably related and incurred in connection with the CRO (the "CRO Expenses"). Further, [GBW] hereby acknowledges *[the Bank] may, in its sole and absolute discretion, pay the CRO Expenses directly to the CRO* and any such amounts paid by [the Bank] shall be added to the Payoff. [GBW] . . . .

See Second Amendment, at pp. 2 and 4-5, § 3(h) (emphasis added).

30. After the Bank's February 21, 2013 discovery and following implementation of its May 2013 procedures requiring the transfer of all of GBW's funds to the Bank's accounts, it possessed complete control over the funds advanced to GBW and the funds disbursed by GBW.

31. In this respect, the Bank was the primary, if not, the sole funding source from which the withholding taxes that were required to be deducted and withheld from the wages of GBW's employees would be paid. From April 1 through December 13, 2013, the Bank refused to advance sufficient funds to pay the withholding taxes on the employees' wages.

32. Based on the limited information available to the United States at this time, it has confirmed that the Bank advanced funds in the following amounts so that GBW could pay net wages to its employees in the following months:

| Month | Funds |
|---|---|
| May, 2013 | $ 38,398.09 |
| June, 2013 | $ 33,938.80 |
| July, 2013 | $ 44,232.58 |
| August, 2013 | $ 35,215.37 |
| October, 2013 | $ 11,626.13 |
| November, 2013 | $ 11,436.00 |

33. On December 6, 2013, the Bank provided written notice to GBW that certain events of default on the Bank's loan had occurred and demanded payment of the outstanding balance of the Bank's loan.

34. On December 13, 2013, the Bank commenced a lawsuit against GBW in the Sixteenth Judicial Circuit in and for Etowah County, Alabama, bearing Case No. CV-2013-901081, seeking, *inter alia*, the appointment of a receiver to manage and control the collateral securing the Bank's loan, liquidate the collateral, and apply the sales proceeds in satisfaction of the Bank's loan.

35. On December 18, 2013, amended by Order entered on January 10, 2014, the state court appointed Andrew J. Bolnick ("Bolnick") to serve as the receiver for GBW.

36. On February 21, 2014, Bolnick, in his capacity as receiver for GBW, conducted a public auction to sell GBW's assets. Upon completion of the public auction, Bolnick received

sales proceeds of approximately $5,578,968, and distributed those proceeds to the Bank to be applied in partial payment of the Bank's loan, leaving a minor deficiency.

37. By Order entered on April 7, 2014, the state court accepted the receiver's final report, discharged him, and closed the receivership case.

38. The Bank's records reflect that the unpaid balance of the Bank's loan as of January 31, 2015, totaled $127,600.80, consisting of an outstanding principal sum of $76,568.46, accrued interest of $50,298.83 and fees of $733.51.

C. *The IRS Notice of Levy Served on the Bank*

39. In November 2013, after the IRS provided GBW a Notice of Intent To Levy and an opportunity for hearing, the IRS served Form 668-A, "Notice of Levy," dated November 6, 2013, on the Bank (the "IRS Notice of Levy"). The IRS Notice of Levy demanded that the Bank surrender "[GBW]'s property and rights to property (*such as money, credits and bank deposits*)" in an amount not to exceed $53,958.95 in order that the IRS may satisfy GBW's unpaid employment tax liability for the tax period ended June 30, 2013. The IRS, by and through Revenue Officer Ron Hill, mailed the IRS Notice of Levy to the Bank at three different locations, Greensboro, North Carolina, St. Louis Missouri, and Hagerstown, Maryland.

40. On November 19, 2013, after receiving the IRS Notice of Levy, the Bank (from Los Angeles, California) advised the IRS that it had "no funds" to surrender.

41. On December 4, 2013, the Bank (from Utica, New York) sent two responses. The first letter stated that there were "[n]o funds available" for surrender. The second letter stated that "[n]o funds available - Bank of America holds a priority security interest in the accounts which are subject to the levy evidence of which is filed with the Alabama Secretary of State in the Uniform Commercial Code filings. File Number B 12-7223966."

42. Although the Bank has alleged a "competing claims" argument, it did not surrender the funds, as required. Nor did it file a timely wrongful levy action under 26 U.S.C. § 7426.

43. Bank records that the IRS secured by summons indicate that there were funds available during the period from November 6, 2013, through December 4, 2013, and that the Bank should have surrendered those funds in response to the IRS Notice of Levy.

44. For instance, on November 6, 2013, GBW maintained Checking Account Nos. 9100 and 9113 at the Bank. According to the November bank statements for those accounts, the balance of Account Nos. 9100 and 9113 as of November 6, 2013, totaled $26,408.03 and $5,408.11, respectively. Accordingly, the Bank had in its possession approximately $31,816.14 of GBW's funds, and therefore, it was obligated to turn those funds over to the IRS. However, rather than turn over the levied funds to the IRS, the Bank depleted them by making several unauthorized withdrawals from GBW's accounts after November 6, 2013. The Bank applied the withdrawals in payment of its loan to GBW.

45. On April 13, 2015, the IRS, by and through Revenue Officer Hill, served Form 668-C, "Final Demand for Payment," on the Bank, making another demand for surrender of the amount in the IRS Notice of Levy. The form also advised that if the Bank did not surrender the funds to the IRS within five days, the United States may sue to enforce the IRS Notice of Levy.

46. On December 23, 2015, a Bank representative advised Revenue Officer Hill that "the Bank wishes to continue their claim for lien priority by not honoring the [IRS Notice of Levy]."

**Count I**
**The Enforcement of the IRS Notice of Levy**

47. The United States adopts by reference and realleges by incorporation each of the allegations contained in paragraphs 1-46 of this complaint.

48. "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the

United States upon all property and rights to property, whether real or personal, belonging to such person." *See* 26 U.S.C. § 6321.

49. "Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time." *See* 26 U.S.C. § 6322.

50. "If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary [of the Treasury] to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy ) by levy upon all property and rights to property (except such property as is exempt under section 6334) belonging to such person or on which there is a federal tax lien [*see* 26 U.S.C. § 6321]." *See* 26 U.S.C. § 6331(a).

51. Except for a continuing levy on salaries and wages, "a levy extends only to property possessed and obligations which exist at the time of the levy." *See* 26 U.S.C. § 6331(b); 26 C.F.R. § 301.6331-1(a)(1). "For example, a levy made on a bank with respect to the account of a delinquent taxpayer is satisfied if the bank surrenders the amount of the taxpayer's balance at the time the levy is made. The levy has no effect upon any subsequent deposit made in the bank by the taxpayer. Subsequent deposits may be reached only by a subsequent levy on the bank." *See* 26 C.F.R. § 301.6331-1(a)(1).

52. "Except as otherwise provided in 26 U.S.C. § 6332, any person in possession of (or obligated with respect to) property or rights to property subject to levy [and] upon which a levy has been made shall, upon demand of the Secretary [of the Treasury], surrender such property or rights [to property] (or discharge such obligation) to the Secretary, except such part of the property or rights [to property] (or obligation) as is, at the time of such demand, subject to an attachment or execution under any judicial process." *See* 26 U.S.C. § 6332(a).

53.     When the IRS levies on a taxpayer's deposits held by a bank, the bank must surrender the amount of funds on deposit at the time the levy is made, up to the amount of the levy, plus any interest thereon, after the passage of 21 calendar days from the date of service of the IRS Notice of Levy (unless the 21-day holding period is waived or extended).  *See* 26 U.S.C. § 6332(c); 26 C.F.R. §§ 301.6332-3(a), (b) and (c).  No withdrawals may be made on levied upon deposits during 21-day holding period, or any extensions thereof.  *See* 26 C.F.R. § 301.6332-3(c)(3).

54.     A bank served with an IRS Notice of Levy has only two defenses for not complying with the levy demand:  (1) it is neither in possession of nor obligated with respect to the property or rights to property belonging to the taxpayer; or (2) any such property or rights to property are subject to prior judicial attachment or execution.  *See United States v. National Bank of Commerce*, 472 U.S. 713, 721-722 (1985).  Neither defense applies in this case.

55.     That the Bank may have a competing claim to the funds held in the account is not a legitimate statutory defense to the IRS Notice of Levy.  *See National Bank of Commerce*, 472 U.S. at 727.  The Bank must surrender the funds and file a wrongful levy action timely.  *See* Rev. Rul. 2006-42, 2006-2 C.B. 337 (Aug. 28, 2006).

56.     When a person is served with an IRS Notice of Levy and fails to assert a valid defense, it must comply with the levy by surrendering the levied property upon demand.

57.     "Any person who, upon demand of the Secretary [of the Treasury], fails or refuses to surrender any property or rights to property subject to levy, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights [to property] not so surrendered, together with costs and interest from the date of the levy, until paid (the "personal liability").  *See* 26 U.S.C. § 6332(d)(1); 26 C.F.R. § 301.6332-1(b)(1); 26 C.F.R. § 301.6332-3(a). The liability, however, may not exceed the amount of taxes sought for collection by the levy.  *See* 26 U.S.C. § 6332(d)(1); 26 C.F.R. § 301.6332-1(b)(1); 26 C.F.R. § 301.6332-3(a).  Interest is to be computed on such sum at the underpayment rate under 26 U.S.C. § 6621.  *See* 26 U.S.C. § 6332(d)(1); 26 C.F.R. § 301.6332-1(b)(1); 26 C.F.R. § 301.6332-3(a).

58.     In addition to the personal liability described in paragraph 57, above, any person who is required to surrender property and rights to property and fails or refuses to do so without reasonable cause shall be liable for a penalty equal to 50 percent of the amount recoverable under 26 U.S.C. § 6332(d)(1).  *See* 26 U.S.C. § 6332(d)(2); 26 C.F.R. § 301.6332-1(b)(2); 26 C.F.R. § 301.6332-3(a).

59.     The Bank has not offered a valid defense justifying its failure to surrender the levied funds to the IRS after expiration of the 21-day holding period.  Although the levied funds were available in GBW's accounts for turnover to the IRS, the Bank nevertheless chose to divert them and apply them in payment of its loan to GBW.

60.     Because the Bank has failed to comply with the IRS Notice of Levy, it is personally liable for the amount not surrendered, plus the 50% penalty (i.e., 50% of the amount owing by the person failing to honor the levy), costs, and interest from the date of levy, until paid.

61.     Having failed to honor the levy by surrendering the funds to the IRS on demand, the United States is entitled to enforcement of the IRS Notice of Levy, and entry of a judgment in favor of the United States, and against Bank of America, in the amount of $16,757, plus the 50% penalty (i.e., $8,379), costs and interest thereon from May 8, 2023, until paid.

## Count II
## The Recovery of Unpaid Withholding Taxes Under 26 U.S.C. § 3505 (a)

62.     The United States adopts by reference and realleges by incorporation each of the allegations contained in paragraphs 1-61 of this complaint.

63.     Lenders shall be personally liable for the payment of unpaid withholding taxes where they pay wages directly to employees employed by a taxpayer employer that is experiencing financial difficulties and lacks sufficient resources to pay the taxes that are required to be deducted and withheld from their employees' wages.  *See* 26 U.S.C. § 3505(a).

64.     A payment constitutes a "direct payment" under 26 U.S.C. § 3505(a) if the payor had: (1) the ability to control the funds; and (2) the right and legal authority to exercise that control. *See e.g., United States v. Arnold*, 573 F.2d 605, 608 (9th Cir. 1978)

65.     When evaluating whether wages are being paid directly, the IRS and the courts look to the "substance" of the transaction and may find that a direct payment of net wages is present even though a "subterfuge" is used to disguise the substance of the arrangement. *See e.g., United States v. Kennedy Construction Co. of NSB, Inc.*, 572 F.2d 492 (11th Cir. 1978).

66.     Liability under § 3505(a) extends to withholding taxes under 26 U.S.C. § 3102 (i.e., withheld FICA taxes) and 26 U.S.C. § 3402 (i.e., withheld income taxes). The lender's liability is a sum equal to the unpaid taxes required to be deducted and withheld from the employees' wages, plus interest thereon from the last day prescribed for filing the employer's federal employment tax returns (i.e., Form 941) (determined without regard to any extensions of time) for the tax periods at issue, until paid. *See* 26 U.S.C. § 3505(a).

67.     Liability under § 3505(a) does not extend to the employer's share of employment taxes. Nor does the liability extend to penalties that the IRS may assess against the employer.

68.     As of May 8, 2023, the unpaid taxes required to be deducted and withheld from the wages of GBW's employees, plus interest thereon from the last day prescribed for filing GBW's federal employment tax returns (i.e., Form 941) for the tax periods ended June 30, September 30, and December 31, 2013, are as follows:

| Tax Period | Form | Taxes | Penalties | Interest | Fees & Costs | Payments | Total (Excluding Accruals) |
|---|---|---|---|---|---|---|---|
| **Form 941** | | | | | | | |
| 6/30/13 | 941 | $ - | $ - | $ 6,566 | $ - | $ - | $ 6,566 |
| 9/30/13 | 941 | - | - | 9,054 | - | - | 9,054 |
| 12/31/13 | 941 | 12,472 | - | 5,711 | - | - | 18,183 |
| Total (Excluding Accruals) | | $ 12,472 | $ - | $ 21,331 | $ - | $ - | $ 33,803 |

69. After February 21, 2013, when the Bank discovered GBW had sold a number of vehicles without reimbursing the Bank for the initial advance required under the Floor Plan Agreement, the Bank exercised complete control over GBW's business operations, including determining what funds would be disbursed in furtherance of those operations. In exercising its control, the Bank chose to divert substantial sums of GBW's funds daily to pay the Bank's loan, rather than pay GBW's unpaid employment tax liabilities for the tax periods ended June 30, September 30, and December 31, 2013. Despite GBW's request for the release of funds to pay the taxes (as required by the Loan Modification Agreement executed on May 13, 2013), the Bank chose to release only funds in an amount necessary to pay the net wages of GBW's employees.

70. The Bank was the primary, if not, the only funding source by which GBW could ensure that it paid the withholding taxes that it was required to deduct and withhold from its employees' wages.

71. Given the degree of control that the Bank exercised over the advancement and disbursement of funds used to pay the net wages of GBW's employees, it is evident that once the Bank took control over GBW's accounts, it became personally liable for the unpaid withholding taxes of GBW's employees under 26 U.S.C. § 3505(a), plus interest thereon. Accordingly, the United States is entitled to entry of a judgment in its favor, and against Bank of America, in the amount of $33,803, plus interest thereon from May 8, 2023, until paid.

### Count III
### The Recovery of Unpaid Withholding Taxes Under 26 U.S.C. § 3505(b)

72. The United States adopts by reference and realleges by incorporation each of the allegations contained in paragraphs 1-71 of this complaint.

73. Lenders shall be personally liable for the payment of withholding taxes if the lender supplies funds to or for the account of a taxpayer employer for the specific purpose of paying wages of the employees of that employer, with actual notice or knowledge (within the meaning of 26 U.S.C. § 6323(i)(1)) that such employer does not intend to or will not be able to make timely

payment or deposit of the amounts required to be deducted and withheld from its employees' wages.  *See* 26 U.S.C. § 3505(b).

74. Before a lender can be liable under § 3505(b), the following two conditions must be met.  *First*, the lender must know that the advanced funds are to be used for the payment of net wages.  This does not include an "ordinary working capital loan" (i.e., loans that are made to enable the borrower to meet current obligations as they arise; they are not earmarked for any particular purpose).  However, if the maker of an "ordinary working capital loan" has actual notice or knowledge at the time of the advancement of funds that the funds or a portion of them will be used to pay net wages, § 3505(b) will apply regardless of whether the written agreement states that the funds were advanced for another purpose.  *See* 26 C.F.R. § 301.3505-1(b)(3); *United States v. Intercontinental Industries, Inc.*, 635 F.2d 1215 (6th Cir. 1980).

75. *Second,* the lender must have "actual notice or knowledge" at the time such funds are advanced that the employer does not intend to or will not be able to make timely payment or deposit of taxes required to be withheld.  The lender has actual notice or knowledge of any fact from the time such fact is brought to its attention or would have been brought to its attention if the organization had exercised due diligence.  *See e.g.*, 26 U.S.C. § 6323(i)(1); 26 C.F.R. § 31.3505-1(b)(3); *United States v. Park Cities Bank and Trust Co.*, 481 F.2d 738 (5th Cir. 1973).

76. Liability under § 3505(b) extends to withholding taxes under 26 U.S.C. § 3102 (i.e., withheld FICA taxes) and 26 U.S.C. § 3402 (i.e., withheld income taxes).  *See* 26 U.S.C. § 3505(b).  Under 26 U.S.C. § 3505(b), the lender becomes personally liable for a sum equal to the unpaid taxes required to be deducted and withheld from the employees' wages, plus interest thereon from the last day prescribed for filing the employer's federal employment tax returns (i.e., Form 941) (determined without regard to any extensions of time) for the tax periods at issue, until paid; provided, however, that the lender's liability shall not exceed 25 percent of the amount of funds it supplied to the employer for the specific purpose of paying the wages of the employees of said employer.  *See* 26 U.S.C. § 3505(b).  The 25% limitation on § 3505(b) liability applies to the

total liability for taxes and prejudgment interest. *See e.g.*, *United States v. Hannan Co.*, 639 F.2d 284, 285-286 (5th Cir. 1981) (citing, *Intercontinental Ind.*, 635 F.2d at 1221-1222; *United States v. Metro Construction Co., Inc.*, 602 F.2d 879, 880-882 (9th *Cir*. 1979)).

**77.** Liability under § 3505(b) does not extend to the employer's share of employment taxes. Nor does the liability extend to penalties that the IRS may impose on the employer.

**78.** As the facts, here, establish, the Bank was not only the largest supplier of funds to facilitate the payment of the employees' net wages, but it also had actual notice and knowledge that the funds would be used to pay the net wages of GBW's employees and that it had no intention in advancing GBW the funds needed to pay the taxes required to be deducted and withheld from the employees' wages. Indeed, as the facts further establish, GBW used the funds to pay its employees' net wages but failed to remit the withholding taxes due in connection with those wages.

**79.** Given the Bank's hands-on knowledge of GBW's financial condition, together with its daily monitoring and exercising of control over the disbursement of funds from GBW's accounts, the Bank was (or should have been) fully aware that GBW was accruing employment tax liabilities that were not being paid for the tax periods at issue and that it was the only source of funding from which those tax liabilities would likely be paid.

**80.** When a lender, like the Bank, advances funds to an employer, like GBW, to pay only its net payroll, making no provision for the withholding of income and FICA taxes, it has actual notice or knowledge that GBW cannot and will not pay the taxes, thus making itself liable for payment of the taxes. As a result, the Bank is personally liable for the unpaid withholding taxes that it neglected to pay, and the United States is entitled to entry of a judgment in its favor, and against Bank of America, in the amount of $33,803, plus interest thereon from May 8, 2023, until paid. *See* ¶ 68, *supra*.

**WHEREFORE**, the plaintiff, United States of America, requests the following relief:

**a.** This Court determine that, pursuant to 26 U.S.C. § 6332(d), the defendant, Bank of America, has failed to comply with the IRS Notice of Levy served on it and the United States is

entitled to entry of a judgment in its favor, and against Bank of America, in the amount of $16,757, plus the 50% penalty of $8,379, costs and interest thereon from May 8, 2023, until paid.

    **b.**    Additionally and/or in the alternative, the Court determine that pursuant to 26 U.S.C. §§ 3505(a) and (b), the defendant, Bank of America, is personally liable for the unpaid withholding taxes of GBW's employees for the tax periods ended June 30, September 30, and December 31, 2013, plus interest thereon, and that the United States is entitled to entry of a judgment in its favor, and against Bank of America, in the amount of $33,803, plus interest thereon from May 8, 2023, until paid.

    **c.**    The Court award the United States its costs in this action, and such other and further relief as justice requires.

Respectfully submitted this 8th day of August 2023.

DAVID A. HUBBERT
Deputy Assistant Attorney General

/s/ Lynne M. Murphy
LYNNE M. MURPHY
Trial Attorney, Tax Division
U.S. Department of Justice
La. Bar No. 20465
D.C. Bar No. 485928
P.O. Box 14198
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 514-5881
E-mail:  lynne.m.murphy@usdoj.gov

OF COUNSEL:

PRIM F. ESCALONA
United States Attorney